FILED

08 JAN 23 AM 11: 2│

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ PDV _____ DEPUTY

1  Lori S. Brody (SBN 150545)
   KAPLAN FOX & KILSHEIMER LLP
2  1801 Century Park East, Suite 1460
   Los Angeles, CA 90067
3  Telephone: 310-785-0800
   Facsimile: 310-785-0897
4
5  Joel B. Strauss
   Jeffrey P. Campisi
6  KAPLAN FOX & KILSHEIMER LLP
   850 Third Avenue, 14th Floor
7  New York, NY 10022
   Telephone: (212) 687-1980
8
9  Richard A. Lockridge           Laurence D. King (SBN 206423)
   Karen H. Riebel                KAPLAN FOX & KILSHEIMER LLP
   Nathan D. Prosser              350 Sansome Street, Suite 400
10 LOCKRIDGE GRINDAL NAUEN PLLP    San Francisco, CA 94104
   100 Washington Avenue South, Suite 2200   Telephone: (415) 772-4700
11 Minneapolis, MN 55401
12 Telephone: (612) 339-6900
13
14 Attorneys for Plaintiffs

15            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF CALIFORNIA
16

17 KENT CARMICHAEL, Individually and On      )   '08 CV 0128 H LSP
18 Behalf of All Others Similarly Situated,  )
                                             )   Civil Action No.
19                    Plaintiff,             )
                                             )   CLASS ACTION COMPLAINT FOR
20        v.                                 )   VIOLATIONS OF THE SECURITIES
                                             )   LAWS
21 LEAP WIRELESS INTERNATIONAL,              )
22 INC., S. DOUGLAS HUTCHESON, MARK          )
   H. RACHESKY, AMIN I. KHALIFA, and         )
23 DEAN M. LUVISA,                           )   DEMAND FOR JURY TRIAL
                                             )
24                    Defendants.            )
                                             )
25                                           )

26
27
28
   ─────────────────────────────────
   COMPLAINT

1       Plaintiff, Kent Carmichael, individually and on behalf of all other persons similarly

2  situated, by his undersigned attorneys, alleges the following based upon Plaintiff's personal

3  knowledge of Plaintiff's own acts, and upon further information and belief as to all other matters,

4  which includes, *inter alia*, the investigation conducted by and through Plaintiff's attorneys,

5  including a review of relevant public filings made by Leap Wireless International, Inc. ("Leap" or

6  the "Company") with the United States Securities and Exchange Commission ("SEC"), as well as

7  regulatory filings and reports, press releases and other public statements issued by the Company,

8  news articles, analysts' reports, and media reports concerning the Company.  Plaintiff believes that

9  substantial evidentiary support will exist for the allegations set forth herein after a reasonable

10  opportunity for discovery.

## I. SUMMARY OF ACTION

12      1.      This is a securities class action on behalf of all persons who purchased or otherwise

13  acquired the common stock of Leap between November 10, 2005, and November 8, 2007, inclusive (the

14  "Class Period"), against Leap and certain of its officers and/or directors for violations of the Securities

15  Exchange Act of 1934 (the "Exchange Act").

16      2.      Leap is a wireless communications carrier that offers digital wireless service under the

17  Cricket Communications, Inc. ("Cricket") and Jump Mobile brands in the United States. Headquartered

18  in San Diego, California, Leap is traded on the NASDAQ under the ticker symbol "LEAP."

19      3.      During the Class Period, Defendants issued materially false and misleading statements

20  regarding the Company's business and prospects.  As a result of Defendants' false statements, Leap stock

21  traded at artificially inflated prices during the Class Period, reaching its all-time high of $99.04 per share

22  on July 25, 2007.  When the truth was finally revealed on November 9, 2007, the price of the Company's

23  publicly traded stock plummeted to close at $36.72, damaging the Plaintiff and the other members of

24  the Class.

27  ////

1

28  COMPLAINT

## II.    JURISDICTION AND VENUE

4.    This action arises under §§10(b) of the Exchange Act of 1934, 15 U.S.C. §§78j(B) and 78t(a), and the rules and regulations promulgated there under, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

5.    This Court has jurisdiction over this action pursuant to §27(a) of the Securities Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

6.    Venue is proper in the Southern District of California pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), because the false statements made by Defendant Leap were made in this District and acts giving rise to the violations complained of herein also occurred in this District.

## III.    PARTIES

7.    Plaintiff purchased Leap common stock during the Class Period as fully set forth in the attached certification and subsequently suffered economic damages.

8.    Defendant Leap, through its subsidiaries, offers digital wireless services in the United States under the Cricket and Jump Mobile brands. The Company offers unlimited local and the U.S. long distance service from the Cricket service area, and unlimited use of multiple calling features and messaging services. It also offers a basic service plan that allows customers to make unlimited calls within their Cricket service area and receive unlimited calls from any area. In addition, the Company provides per-minute prepaid service, instant messaging, multimedia messaging, games and roaming services, voicemail, caller ID and call waiting, unlimited text messaging, instant messaging, directory assistance calls, and ring tone services. Leap sells Cricket handsets and service, primarily through its own retail locations and kiosks, and authorized dealers and distributors, including premier dealers, local market authorized dealers, national retail chains, and other indirect distributors. Defendant Leap began as a spin-off of QUALCOMM. The Company was incorporated in June 1998, and in September of that same year began trading on NASDAQ. Leap launched its Cricket wireless service in March of 1999 in Chattanooga, Tennessee and from this initial launch the Company grew steadily for several years,

2

COMPLAINT

1    launching service in primarily smaller, rural markets. On April 13, 2003, the Company filed for Chapter

2    11 bankruptcy protection. The Company was restructured and emerged from bankruptcy on August 16,

3    2004. As of December 31, 2006, the Company offered services in 22 states to approximately 2,230,000

4    customers. The Company is headquartered in San Diego, California.

5        9.    Defendant S. Douglas Hutcheson ("Hutcheson") is, and was at all relevant times, a

6    director, President and Chief Executive Officer ("CEO") of Defendant Leap. Hutcheson is currently

7    serving as interim Chief Financial Officer ("CFO") after Amin I. Khalifa's abrupt departure from the

8    Company in September of 2007. During the class period, Hutcheson sold 23,923 artificially inflated

9    Leap shares for proceeds of approximately $1.9 million.

10       10.    Defendant Mark H. Rachesky ("Rachesky") is, and was at all relevant times, a director

11   and Chairman of the Board of the Company.

12       11.    Defendant Amin I. Khalifa ("Khalifa") served as CFO of Leap from August 2006 until

13   his sudden resignation from the Company on September 6, 2007.

14

15       12.    Defendant Dean M. Luvisa ("Luvisa") has served as Vice President of Finance for the

16   Company since March 2006. He had previously served as acting CFO until August of 2006. During the

17   Class Period, Luvisa sold 6,422 artificially inflated Leap shares for proceeds of approximately $322,032.

18       13.    Defendants Hutcheson, Rachesky, Khalifa, and Luvisa as named above, may collectively

19   be referred to herein as the "Individual Defendants."

20       14.    Individual Defendants, as senior officers and spokespersons of Leap, were the controlling

21   person(s) of the Company within the meaning of §20(a) of the Exchange Act and as such, exercised their

22   power and influence to cause the Company to engage in the unlawful conduct complained of herein.

23       IV.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

24       15.    Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal

25   Rules of Civil Procedure on behalf of a Class consisting of Plaintiff and all other persons or entities who

26   purchased or otherwise acquired the securities of Defendant Leap on the open market during the Class

27                                                        3

28   COMPLAINT

1    Period. Excluded from the Class are the Defendants, members of their immediate families, officers and

2    directors of Leap, members of their immediate families, the heirs, successors or assigns of any of the

3    foregoing and any entity in which any Defendants have or had a controlling interest.

4        16.    The members of the Class are so numerous that joinder of all members is impracticable.

5
6    The disposition of their claims in a class action will provide substantial benefits to the parties and the

7    Court. Leap has over 61.16 million shares of outstanding stock, owned by hundreds if not thousands of

8    persons, registered, and listed on NASDAQ trading under the symbol "LEAP." While the exact number

9    of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate

10   discovery, Plaintiff believes that there are thousands of members of the proposed Class. Record owners

11   and other members of the Class may be identified from records maintained by the Company or its

12   transfer agent and can be notified of the pendency of this action by mail and published notice.

13
14       17.    Plaintiff's claims are typical of the claims of the members of the Class as all members of

15   the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities

16   laws that are complained of herein.

17       18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and

18   has retained counsel competent and experienced in class action and securities litigation.

19       a.    Common questions of law and fact exist as to all members of the Class and predominate

20   over any questions solely affecting individual members of the Class. Among the questions of law and

21
22   fact common to the Class are:

23       b.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

24       c.    whether statements made by Defendants to the investing public during the Class Period

25   misrepresented material facts about the business, operations, and financial condition of the Company;

26

27

28

4

COMPLAINT

d.      whether Defendants acted knowingly or recklessly in making materially false and misleading statements during the Class Period;

e.      whether the market prices of the Company's common stock were artificially inflated or distorted during the Class Period due to Defendants' conduct complained of herein; and

f.      to what extent the members of the Class have sustained damages and the proper measure of damages.

19.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.      FRAUDULENT SCHEME AND COURSE OF BUSINESS

20.      Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Leap. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Leap common stock was a success, as it: (i) deceived the investing public regarding Leap's prospects and business; (ii) artificially inflated the price of Leap's common stock; (iii) allowed Defendants Hutcheson to sell his own Leap stock at artificially inflated prices; and (iv) caused Plaintiff and other members of the Class to purchase Leap common stock at artificially inflated prices.

## BACKGROUND

21.      Defendant Leap, through its subsidiaries, offers discount digital wireless services in the United States under the Cricket and Jump Mobile brands. The Company offers unlimited local and the U.S. long distance service from Cricket service area, and unlimited use of multiple calling features and messaging services.

5

COMPLAINT

22.    In November of 2007 the Company shocked the investment world when it announced that it was restating its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to correct errors in previously reported service revenues, equipment revenues, and operating expenses.

23.    The restatements were the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007.

24.    The announcement concerning the Company's accounting problems and internal accounting controls caused the stock price to plummet from the artificially inflated prices the Company's stock was traded at during the class period.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

25.    On November 9, 2005, after the close of trading, the Company issued a press release entitled "Leap Reports Results for Third Quarter of 2005; Solid Performance Marked by Strong Year-Over-Year Growth in Customers, Total Revenues and Adjusted EBITDA"  The release stated in part:

> Leap Wireless International, Inc. (NASDAQ:LEAP), a leading provider of innovative and value-driven wireless communications services, today announced strong financial results for the third quarter of 2005. These results reflect continued strong year-over-year growth in total revenues and adjusted consolidated earnings before interest, taxes, depreciation and amortization (EBITDA).

> Total consolidated revenues for the third quarter were $230.5 million, an increase of $23.6 million over the total consolidated revenues of $206.9 million for the third quarter of 2004. Consolidated operating income for the third quarter was $28.6 million, an increase of $26.4 million over consolidated operating income of $2.2 million for the third quarter of 2004. Consolidated net loss for the third quarter totaled $7.6 million, or a loss of $0.13 per diluted share. This compares to consolidated net income in the third quarter of 2004 of $957.3 million, which included $963.2 million of reorganization items, net, reflecting the net impact of fresh-start reporting and other bankruptcy related items.

> "Our performance during the third quarter reflects an overall strengthening of our business as our product development activities, distribution improvements and marketing strategies have taken effect," said Doug Hutcheson, president and chief executive officer of Leap. "Once again, we have demonstrated an ability to generate solid operational performance, even while supporting the costs associated with our new market launch activities and systems upgrades to meet regulatory requirements

6

COMPLAINT

1    and to support future improvements in efficiency. We are on track to meet our goals
     for 2005 while implementing our strategic plans, and we are looking toward the
2    coming year with great anticipation."

3        26.    On November 11, 2005, the Company filed its third quarter results for 2005 with the

4    SEC. The filing was signed by Defendants Hutcheson and Luvisa and repeated the results set forth in

5    the November 9, 2005 press release.

6        27.    On March 16, 2006, the Company issued a press release entitled "Leap Reports Results

7    for Fourth Quarter and Full Year 2005; Company Delivers Strong Year-over-Year Growth in Service

8    Revenues and Adjusted OIBDA; Positive Growth Trend Evident in Company's Outlook for First Quarter

9    of 2006" The release stated in part:

10

11       Leap Wireless International, Inc. (NASDAQ:LEAP), a leading provider of
         innovative and value-driven wireless communications services, today announced
12       consolidated financial and operational results for the fourth quarter and full year
         ended December 31, 2005, reflecting strong year-over-year growth in service
13       revenues and adjusted operating income before depreciation and amortization
         (OIBDA) . . .
14

15       Total revenues for the fourth quarter were $228.9 million, an increase of $22.3
         million over the total revenues of $206.6 million for the fourth quarter of 2004.
16

17       Operating income for the fourth quarter was $10.8 million, an increase of $5.9
         million over the $4.9 million for the fourth quarter of 2004. Net income was $5.0
18       million for the fourth quarter, or $0.08 per diluted share. This compares to the net loss
         of $6.6 million, or $0.11 per diluted share, for the fourth quarter of 2004.

19
         "The Company had another successful quarter, reflecting continued execution
20       of the strategic growth plans we have established for our business," said Doug
         Hutcheson, president and chief executive officer of Leap. "Based on the results of the
21       fourth quarter and full year 2005, and our first quarter outlook for new customers and
         adjusted OIBDA, we believe the broad impact and value of our actions are becoming
22       evident. We look forward to continuing progress in the coming year as we expand our
         services and market presence throughout 2006."
23

24       For the full year 2005, total revenues were $914.7 million, an $88.7 million
         improvement over total revenues of $826.0 million for the full year 2004. Operating
25       income for 2005 was $69.8 million, an increase of $100.0 million over an operating
         loss of $30.2 million for 2004. Net income for 2005 was $30.0 million, or $0.49 per
26       diluted share. This compares to net income of $904.8 million for the full year 2004,

27
                                              7
28   COMPLAINT

which included $962.4 million of reorganization items, net, reflecting the net impact of fresh-start reporting and other bankruptcy-related items.

28.    On March 27, 2006, the Company filed its Annual Report for 2005 with the SEC. The filing was signed by Defendants Hutcheson, Rachesky and Luvisa and repeated the results set forth in the March 16, 2006 press release.

29.    On May 9, 2006, the Company issued a press release entitled "Leap Reports Consolidated Results for First Quarter 2006; Improvement in Customer Growth and Record Breaking Adjusted OIBDA Underscore Company's Strong Financial and Operational Performance". The release stated in relevant part:

> -- Strong net customer growth with over 110,000 net customer additions for the quarter, up approximately 140% from net customer additions for the first quarter of 2005

> -- Total consolidated revenue for the quarter of $266.7 million, a 17% increase from the total consolidated revenue for the first quarter of 2005

> -- Consolidated operating income of $19.9 million, compared to $21.9 million in the same period last year . . .

> "The Company had a successful quarter, delivering strong customer growth and record-breaking adjusted OIBDA performance," said Doug Hutcheson, chief executive officer and president of Leap. "The business continues to execute well on our strategic growth plans. Our total net customer growth for the quarter included approximately 82,000 new subscribers in markets operating at the end of 2005, with approximately 28,000 additional new customers coming from the markets launched during the quarter. We are looking forward to improving results over the coming quarters in our existing markets and from the launch of additional new markets planned for 2006. We expect our customer behavior will continue to have a seasonal rhythm and may be affected by rising energy prices in the short-term."

30.    On May 10, 2006, the Company filed its results for the first quarter of 2006 with the SEC. The filing was signed by Defendants Hutcheson and Luvisa and repeated the results set forth in the May 9, 2006 press release.

31.    On August 3, 2006, the Company issued a press release entitled "Leap Reports Consolidated Results for Second Quarter 2006; Strong Performance Led by Growth in Service Revenues

8

COMPLAINT

1   and Operating Income".  It stated in part:

2          -- Consolidated operating income of $16.5 million, a 92% increase from the
3          consolidated operating income for the second quarter of 2005 . . .

4          "The Company executed very well on its major initiatives, posting strong
5          financial results as it expanded the footprint of Cricket(R) service to more than 37.3
           million potential covered subscribers by the end of the second quarter," said Doug
6          Hutcheson, chief executive officer and president of Leap. "The Company delivered
7          continuing attractive customer growth despite some unanticipated disruptions, which
           have been addressed. We remain very pleased with the pace and performance of our
8          new market launches and we look forward to additional strong growth in the second
           half of the year. We believe that the continued performance improvements we have
9          seen in our existing markets and the progress of new market launches during the
           quarter indicate that the business is well-positioned to deliver continued growth and
10         attractive financial performance in the coming quarters."

11

12         32.    On August 4, 2006, the Company filed its results for the first quarter of 2006 with the

13  SEC. The filing was signed by Defendants Hutcheson and Luvisa and stated repeated the results set forth

14  in the August 3, 2006 press release.

15         33.    On November 7, 2006, the Company issued a press release entitled "Leap Reports

16  Consolidated Results for Third Quarter 2006 - Company's Strong Operational and Financial

17  Performance During the Third Quarter Led by Solid Year-over-Year Growth in Net Customer Additions

18  and Service Revenues".  It stated in part:

19
           -- Total consolidated revenue for the quarter of $287.5 million, a 25 percent
20         increase from the third quarter of 2005

21         -- Consolidated operating income of $17.0 million . . . .

22
           "The Company produced attractive operating results, successfully launched a
23         series of new markets, achieved outstanding results in Auction #66 and completed a
           series of capital market activities on favorable terms," said Doug Hutcheson, chief
24         executive officer and president of Leap.

25         34.    On November 8, 2006, the Company filed its results for the first quarter of 2006 with the

26  SEC.  The filing was signed by Defendants Hutcheson and Luvisa and repeated the results in the

27                                                  9

28  COMPLAINT

1    November 7, 2006 press release.

2        35.    On February 27, 2007, Leap issued a press release entitled "Leap Reports More than

3    260,000 Net Customer Additions in the Fourth Quarter and Completes Launch of Approximately 20

4    Million Covered POPs by Year End - Leap Finishes Year of Strong Execution with Solid Growth in

5    Existing Markets, Launch of 14 New Markets, Purchase of Additional Spectrum and Enhanced Capital

6    Structure." The press release stated in part:

7        Leap Wireless International, Inc. (NASDAQ: LEAP), a leading provider of
8    innovative and value-driven wireless communications services, today announced
     financial and operational results for the fourth quarter and year ended December 31,
9    2006. Both periods showed significant growth in total consolidated revenues, lifted by
     strong year-over-year improvements in net customer additions and average revenue
10   per user (ARPU).

11       "Our 2006 results reflect well-executed strategies for growth, anchored on the
12   distinct value of our unlimited service propositions and the low-cost structure
     supporting these strategies," said Doug Hutcheson, Leap's chief executive officer and
13   president. "In 2006, Leap and its joint ventures expanded Cricket(R) coverage to
     approximately 48 million covered POPs, completing this process on time and within
14   budget. Our fourth quarter and full year 2006 results reflect the contributions of this
     new market activity on customer additions, as well as the expected initial negative
15   impact of new market launch activity on consolidated operating and net income."

16

17       36.    On May 8, 2007, Leap issued a press release entitled "Leap Reports 318,000 Net

18   Customer Additions in First Quarter 2007, Nearly Triple Net Additions in First Quarter 2006; Company

19   reports solid adjusted operating income before depreciation and amortization (OIBDA) of $81 million,

20   up 38% compared to fourth quarter" The press release stated in part:

21       Leap Wireless International, Inc. (NASDAQ: LEAP), a leading provider of
22   innovative and value-driven wireless communications services, today announced
     financial and operational results for the first quarter 2007. The company reported
23   service revenues of $326.8 million, a 51 percent increase over the prior year quarter,
     driven by a 39 percent growth in weighted average customers and a nine percent rise
24   in average revenue per user (ARPU). For the first quarter, the company posted
     adjusted operating income before depreciation and amortization (OIBDA) of $81.0
25   million, up $22.1 million from the fourth quarter of 2006, and up $2.4 million from
     the comparable period of the prior year, even after the company absorbed expenses
26   associated with the cost of acquiring a substantial number of new customers and the
27   impact of new markets launched in 2006. Operating income for the quarter was $4.4

     10

28   COMPLAINT

million compared to $19.9 million for the first quarter of 2006, reflecting the impact of additional depreciation expense associated with new market expansion.

- "During the quarter, we saw continued strong customer acceptance of our unlimited value proposition as demonstrated not only by customer additions, but also by the continued acceptance of our higher-value service plans," said Doug Hutcheson, Leap's chief executive officer and president.

37. On May 10, 2007, the Company filed its results for the first quarter of 2007 with the SEC. The filing was signed by Defendants Hutcheson and Khalifa and repeated the results set forth in the May 8, 2007 press release.

38. On August 7, 2007, the Company issued a press release entitled "Leap Reports Second Quarter 2007 Adjusted OIBDA of $115 Million, Up 48% Compared to Prior Year Quarter, New Markets in Aggregate Begin Contributing Positively to Adjusted OIBDA; Company Reports 127,000 Net Customer Additions, More Than Double Net Additions from Second Quarter 2006." The press release stated in part:

Leap Wireless International, Inc. (NASDAQ:LEAP), a leading provider of innovative and value-driven wireless communications services, today announced financial and operational results for the second quarter 2007. The company reported service revenues of $350.2 million, a 52 percent increase over the prior-year quarter, driven by a 45 percent growth in weighted-average customers and a five percent rise in average revenue per user (ARPU). In the second quarter, the company posted adjusted operating income before depreciation and amortization (OIBDA) of $115.2 million, up $34.2 million from the first quarter of 2007 and up $37.5 million from the comparable period of the prior year. Operating income for the quarter was $36.9 million compared to $16.5 million for the second quarter of 2006.

"In the second quarter, we continued to experience attractive customer growth over the prior year period, including 115,000 net customer additions in the new markets launched in 2006 and 2007. With the addition of 12,000 new customers in existing markets during the quarter, net customer additions increased approximately 60 percent over the prior year quarter and approximately 30 percent during the first half of the year as compared to the prior year period, in each case after adjusting for the sale of our Toledo and Sandusky, Ohio markets in 2006," said Doug Hutcheson, Leap's chief executive officer and president. "During the quarter, we saw strong acceptance of our new higher-value service plans from both new and existing customers, resulting in ARPU of $45.13. As a result of the success we have seen with the uptake of our new service plans, we expect to see continued upward pressure on

11

COMPLAINT

ARPU over the coming quarters, subject to normal seasonal fluctuations. Second quarter ARPU declined from the first quarter of 2007 due to our typical seasonal rhythms and customer deactivations associated with the increase in less tenured customers from our market-launch successes."

39.    On August 9, 2007, the Company filed its results for the second quarter of 2007 with the SEC. The filing was signed by Defendants Hutcheson and Khalifa and repeated the results set forth in the August 7, 2007 press release.

## The Truth Revealed

40.    Finally on November 9, 2007, before the market opened, the Company issued a press release entitled "Leap Announces Restatement of Prior Period Results; Company Also Releases Preliminary Financial Results for the Third Quarter and Business Outlook for Fourth Quarter of 2007." The press release stated in relevant part:

> *Leap Wireless International, Inc. today announced that it will restate its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to correct for errors in previously reported service revenues, equipment revenues, and operating expenses. Over these periods, the restatements are expected to result in a net cumulative reduction of approximately $20 million in service revenues and approximately $20 million in operating income.* The estimated effect of these errors on the Company's prior period results for service revenues and operating income is set forth below. Changes in net income (loss) will be determined following the Company's completion of its tax expense calculations for these periods. *As a result of the pending restatements, the Company's previously issued financial statements for periods from fiscal year 2004 through the second quarter of 2007 should not be relied upon. In reaching this conclusion,* the Company's management and Audit Committee have discussed the matters described in this press release with the Company's independent registered public accounting firm.
>
> The restatements are the result of an internal review of the Company's service revenue activity and forecasting process that was initiated by management in September 2007 and are not attributable to any misconduct by Company employees. The expected adjustments to historical financial results do not change unrestricted cash, cash equivalents and short term investments as of June 30, 2007. In addition, they do not materially change the overall trend in service revenues, nor do they materially change overall trends in ARPU, CPGA, CCU or capital expenditures. Finally, the expected adjustments do not impact previously reported results for net customer additions or churn.

12

COMPLAINT

Description of Accounting Errors

The most significant adjustment relates to the Company's prior accounting for a group of customers who voluntarily disconnected service. These customers comprised a small percentage of the Company's disconnected customers. For these customers, approximately one month of deferred revenue that was recorded when the customers' monthly bills were generated was mistakenly recognized as revenue after their service was disconnected. The Company also identified other errors relating to the timing and recognition of certain service revenues and operating expenses. The effect of the timing errors varied across periods. The error with the largest variation across periods related to the reconciliation of billing system data for pay in arrears customers. This error resulted in an understatement of revenue in 2004 and 2005 and an overstatement of revenue in subsequent periods as the number of pay in arrears customers in the Company's customer base declined.

In connection with management's review, errors were also identified relating to the classification of certain components of equipment revenues and cost of equipment. Prior to June 2007, approximately $120 million of revenue from the sale of equipment was offset against related cost of equipment and reported on a net basis. The reclassification of these revenues and costs on a gross basis will not impact operating income.

Estimated Adjustments to Prior Period Results

*    *    *

The date and time of the Company's third quarter earnings release and conference call will be provided in a separate press release.

The pending restatements and preliminary third quarter results described above are subject to adjustment upon finalization of third quarter financial and operational results and completion of the audit and review of the Company's restated financial statements by its independent registered public accounting firm.

Business Outlook for Fourth Quarter of 2007

-- Net customer additions are expected to be between 70,000 and 130,000, reflecting normal seasonal rhythms and the maturation of the markets launched in 2006.

-- Customer churn is expected to be in the range of 4.4 percent to 4.7 percent, reflecting typical seasonal rhythms and the effects of customer handset upgrades and improving trends related to the percentage of less-tenured customers within our overall customer base.

13

COMPLAINT

-- Adjusted OIBDA is expected to be between $105 million and $115 million, bringing anticipated full year adjusted OIBDA to between $385 and $395 million. The Company's expectation for fourth quarter and full year adjusted OIBDA includes approximately $12 to $17 million of negative adjusted OIBDA we expect to incur to support our major new initiatives, including the Company's planned coverage expansion, higher-speed data services, Auction #66 build activity and other strategic activities.

Senior Secured Credit Agreement and Indenture

The restatements described above may result in a default under the senior secured credit agreement among Cricket Communications, Inc., Leap Wireless International, Inc., Bank of America, N.A. and certain lenders, under which approximately $890 million in borrowings is currently outstanding. This potential default arises from the Company's potential breach of representations regarding the presentation of its prior financial statements and not as a result of any noncompliance with its financial covenants. Notwithstanding any potential default, the Company expects to continue to make scheduled payments of principal and interest under the credit agreement. The Company is pursuing a waiver of any potential default from the credit agreement lenders. Unless waived by the required lenders, a default would permit the administrative agent to exercise its remedies under the credit agreement, including declaring all outstanding debt under the credit agreement to be immediately due and payable. An acceleration of the outstanding debt under the credit agreement would also trigger a default under Cricket's indenture governing its $1.1 billion of 9.375% senior notes due 2014. The Company anticipates that the required lenders under the credit agreement will agree to waive any potential default that may occur as a result of the restatements; however, such actions cannot be assured.

In conjunction with the waiver, the Company is also asking lenders to approve other amendments to the credit agreement, including an amendment that would provide that entry into an agreement leading to a change of control will no longer constitute an event of default, unless and until the change of control occurs.

(Emphasis added).

41.     As a result, Leap's stock collapsed $21.38 per share to close at $36.72 per share, a one-day decline of over 36% on unusual heavy trading volume of 11 million shares, 10 times the average three-month volume.

42.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, as the public statements set forth herein, were as follows:

(a)     The Company's financial statements were materially misstated due to its failure to

14

COMPLAINT

1   properly account for its service revenue in violation of GAAP. Specifically, the Company

2   materially overstated revenue and operating income;

3   (b)   The Company's financial statements were materially misstated due to its failure to

4   properly account for its equipment revenue and cost of equipment in violation of GAAP;

5   (c)   The Company lacked requisite internal controls, and, as a result, the Company's

6   projections and reported results issued during the Class Period were based upon defective

7   assumptions and/or manipulated facts.

8   43.   As a result of Defendants' false statements, Leap's stock price traded at inflated levels

9   during the Class Period. However, after the shocking revelations were released into the market on

10   November 9, 2007, the Company's shares were hit with massive sales, sending the share of the

11   Company's stock down over 62% from the Class Period high.

12   **LEAP'S FALSE FINANCIAL REPORTING DURING THE CLASS PERIOD**

13   44.   In order to inflate the price of Leap's stock, Defendants caused the Company to falsely

14   report its results for 2004 through the Second Quarter of 2007, which inflated the Company's revenue

15   and operating income. The Company subsequently had to admit that its financial statements for 2004

16   through the Second Quarter of 2007 should not be relied upon.

17   45.   The results for 2004 through the Second Quarter of 2007 were included in Form 10-Ks

18   and 10-Qs filed with the SEC. The results were also included in press releases disseminated to the

19   public.

20   46.   Leap has now admitted that it improperly accounted for its service and equipment

21   revenue and operating expenses and will have to restate its results to remove improperly reported income

22   and expenses, such that its 2004 through the Second Quarter of 2007 financial statements were not a fair

23   presentation of Leap's results and were presented in violation of GAAP and SEC rules.

24   47.   Due to these accounting improprieties, the Company presented its financial results and

25   statements in a manner which violated GAAP, including but not limited to the following fundamental

26

27   15

28   COMPLAINT

accounting principles:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated;

(b)   The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated;

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated;

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general;

(e)   The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance;

(f)   The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting;

(g)   The principle of completeness, which means that nothing is left out of the information

16

COMPLAINT

that may be necessary to insure that it validly represents underlying events and conditions was violated; and

(h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.

48.  Further, the undisclosed adverse information concealed and misrepresented to the public by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## VI.    LOSS CAUSATION/ECONOMIC LOSS

49.  During the Class Period, as detailed herein, Defendants made false and misleading statements concealing the Company's true financial position and the truth was revealed only after the Company restated its financial statements for fiscal years 2004, 2005 and 2006 and for the first and second quarters of 2007 to correct for errors in previously reported service revenues, equipment revenues, and operating expenses. Defendants' acts artificially inflated Leap's stock price and operated as a fraud or deceit on the Plaintiff and the Class.  When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Leap's stock price fell precipitously, as the prior artificially inflated Company's stock price plummeted.  As a result of purchasing Leap's stock at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered damages under the federal securities laws.

## VII.   SCIENTER ALLEGATIONS

50.  As alleged herein, Defendants acted with scienter in that Defendants knew that the public

COMPLAINT

1 documents and statements issued or disseminated in the name of the Company were materially false and

2 misleading; knew that such statements or documents would be issued or disseminated to the investing

3 public; and knowingly or recklessly, substantially participated or acquiesced in the issuance or

4 dissemination of such statement or documents as primary violators of federal securities laws.

5       51.    As set forth herein in detail, Defendants by virtue of their receipt of information reflecting

6 the true facts regarding Leap's business practices, revenue recording and accounting policies, their

7 control over, and/or receipt and/or modification of Leap's materially false and misleading statements

8 and/or associations with the Company, which made them privy to confidential proprietary information

9 concerning Leap, participated in the fraudulent scheme alleged herein.

10      52.    Defendants knew or recklessly disregarded the falsity and misleading nature of the

11 information which they caused to be disseminated to the investing public.

12      53.    Plaintiff as well as other Class members suffered economic loss as a direct result of

13 Defendants' fraudulent scheme to artificially inflate the Company's stock price through prior

14

15 misrepresentations and other fraudulent conduct.

16      54.    The ongoing fraudulent scheme described herein could not have been perpetrated over a

17 substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the

18 highest level of the Company, including the Individual Defendants.

19                   VIII.   FRAUD ON THE MARKET

20      55.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market

21 doctrine in that, among other things:

22      (a)    Defendants made public misrepresentations or failed to disclose material facts during the

23             Class Period;

24      (b)    The omissions and misrepresentations were material;

25      (c)    The Company's stock traded in an efficient market;

26      (d)    The Company's stock met the requirements for listing on NASDAQ, a highly efficient

27                                      18

28 COMPLAINT

and automated market;

(e)   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(f)   Plaintiff and other members of the Class purchased the Company's stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresentations or omitted facts.

56.   At all relevant times, the market for Leap stock was efficient for the following reasons, among others;

(a)   As a regulated issuer, Leap filed periodic public reports with the SEC; and

(b)   Leap regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

57.   As a result of the foregoing, the market for Leap's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in Leap's publicly traded stock price. Under these circumstances, all purchasers of Leap securities during the Class Period suffered similar injury through their purchase of Leap securities at artificially inflated prices and a presumption of reliance applies.

## IX.   NO SAFE HARBOR

58.   The statutory safe harbor provided forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in

19

COMPLAINT

the purportedly forward looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Leap who knew that those statements were false of misleading when made.

### COUNT I

**For Violation of § 10(b) of the 1934 Act and Rule 10 b-5**
**Against All Defendants**

59.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

60.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    This Count is asserted against all Defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission.

62.    During the Class Period, Defendants, singly and in concert, directly or indirectly, engaged in a common plan, scheme, and unlawful course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs and the

20

COMPLAINT

other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was to induce Plaintiff and the other members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

63. During the Class Period, Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the preparation and issuance of deceptive and materially false and misleading statements to the investing public which were contained in or omitted from various documents and other statements, as particularized above.

64. Defendants knew and intended to deceive Plaintiff and the other members of the Class, or in the alternative, acted with reckless disregard for the truth, when they failed to disclose or cause the disclosure of the true facts to Plaintiff and the other members of the Class.

65. As a result of the dissemination of the false and misleading statements set forth above, the market price of the Company's securities were artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above and the deceptive and manipulative devices and contrivances employed by Defendants, Plaintiff and the other members of the Class relied to their detriment on the integrity of the market price of the stock in purchasing the Company's securities. Had Plaintiff and the other members of the Class known of the materially adverse information misrepresented or not disclosed by Defendants, they would not have purchased the Company's securities at the artificially inflated prices that they did.

66. As a result of the inflation of the prices of Leap securities during the Class Period caused by Defendants' material misrepresentations and omissions, Plaintiff and the other members of the Class have suffered substantial damages.

67. By reason of the foregoing, Defendants, directly or indirectly, violated the 1934 Act and Rule 10b-5 promulgated thereunder in that they:

21

COMPLAINT

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, and a course of business which operated as a fraud and deceit and a scheme to defraud upon Plaintiff and the other members of the Class in connection with their purchases of Leap common stock during the Class Period.

68.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Leap common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against the Individual Defendants

69.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if fully set forth herein.

70.     The Individual Defendants acted as controlling persons of Leap within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about the Company, the Individual Defendants had the power and ability to control the actions of Leap and its employees. The Company controlled the Individual Defendants and its other officers and employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

71.     The Individual Defendants' positions made them privy to, and provided them with actual knowledge of, the material facts which the Company concealed from Plaintiff and the other members of the Class during the Class Period.

22

COMPLAINT

72.    Each of the Individual Defendants had the power and influence, and exercised same, to cause the Company to engage in the unlawful conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above.

73.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

74.    By reason of the conduct alleged in Count I of the Complaint, Individual Defendants are each liable for the aforesaid wrongful conduct, and are liable to Plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff, on behalf of himself and the members of the Class, prays for judgment as follows:

A.    Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.    Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.    Awarding monetary damages against all Defendants, jointly and severally, in favor of Plaintiff and the other members of the Class for all losses and damages suffered as a result of the acts and transactions complained of herein, together with prejudgment interest from the date of the wrongs to the date of the judgment herein;

E.    Awarding Plaintiff the costs, expenses, and disbursements incurred in this action, including reasonable attorneys' and experts' fees; and

23

COMPLAINT

1        F.    Awarding Plaintiff and the other members of the Class such other and further

2  relief as the Court may deem just and proper in light of all the circumstances of this case.

3

**JURY DEMAND**

4

Plaintiff demands a trial by jury on all issues.

5

6

7  DATED: January 22, 2008.          **KAPLAN FOX & KILSHEIMER LLP**

8

9                                Lori S. Brody (SBN 150545)
                                1801 Century Park East, Suite 1460

10                           Los Angeles, CA 90067
                           Telephone: (310) 785-0800

11

12                           **KAPLAN FOX & KILSHEIMER LLP**
                           Laurence D. King (SBN 206423)

13                           350 Sansome Street, Suite 400
                           San Francisco, CA 94104

14                           Telephone: (415) 772-4700

15                           **KAPLAN FOX & KILSHEIMER LLP**
                           Joel B. Strauss

16                           Jeffrey P. Campisi
                           850 Third Avenue

17                           New York, NY 10022
                           Tel: (212) 687-1980

18

19                           **LOCKRIDGE GRINDAL NAUEN PLLP**
                           Richard A. Lockridge

20                           Karen H. Riebel
                           Nathan D. Prosser

21                           100 Washington Avenue South
                           Suite 2200

22                           Minneapolis, MN 55401
                           Tel: (612) 339-6900

23

24                         **Attorneys for Plaintiff**

25

26

27

24

28  COMPLAINT

## PLAINTIFF CERTIFICATION

I, _Kent Carmichael_, hereby state:

1.      I have reviewed a Complaint against Leap Wireless International, Inc., and certain of its officers and directors, and authorized the filing of the same or a similar complaint on my behalf.

2.      I did not purchase any Leap Wireless International, Inc. securities at the direction of counsel or in order to participate in this private action.

3.      I am willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      The following includes all of my transactions in Leap Wireless International, Inc. securities during the Class Period as defined in the Complaint:

| TRANSACTION (PURCHASE, SALE, EXCHANGE, CALL, PUT, ETC.) | TRADE DATE | PRICE | QUANTITY |
|---|---|---|---|
| PURCHASE | 5/4/07 | 78.40 | 35 |

5.      I have filed the following civil actions as a representative party on behalf of a class under the federal securities laws during the last three years.

6.      I will not accept any payment for serving as a representative party on behalf of a class except to receive my pro rata share of any recovery, or as ordered or approved by the Court, including the award to a representative party of reasonable costs and expenses including lost wages relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _28th_ day of _December_, 2007.

_____
(signature)
_Kent Carmichael_
(print name)
_Fayette, Kentucky_
(county of residence)

375086-1

Jan 22 2008 2:02PM    KAPLAN FOX-LA                3107850897                    p.2

JS 44 (Rev. 11/04)                        **CIVIL COVER SHEET**        FILED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| KENT CARMICHAEL, Individually and On Behalf of All Others Similarly Situated | LEAP WIRELESS INTERNATIONAL, INC., et al. [see attachment for additional defendants] CLERK, U.S. DISTRICT COURT SOUTHERN DISTRICT OF CALIFORNIA |

**(b)** County of Residence of First Listed Plaintiff  **Fayette, Kentucky**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)    DEPUTY
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
KAPLAN FOX & KILSHEIMER LLP, 1801 Century Park East, Suite 1460, Los Angeles, CA 90067, Tel: (310) 785-0800

Attorneys (If Known)


**'08 CV 0128 H LSP**    via PDF

| II. BASIS OF JURISDICTION (Place an "X" in One Box Only) | | III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) | | | | |
|---|---|---|---|---|---|---|
| | | (For Diversity Cases Only) | | | | |
| | | | PTF | DEF | | PTF DEF |
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 ☐ 4 |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 ☐ 5 |
| | | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
§§ 10(b) of the Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a)
Brief description of cause:
Securities Class Action

**VII. REQUESTED IN COMPLAINT:**
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions): JUDGE Moskowitz
DOCKET NUMBER 07-2245, 07-2256, 07-2297

DATE  1/22/2008
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY
RECEIPT # 146764  AMOUNT $350  1/23/08 KH  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

## ATTACHMENT TO CIVIL COVER SHEET

S. DOUGLAS HUTCHESON, MARK H. RACHESKY, AMIN I. KHALIFA, and
DEAN M. LUVISA

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 146764    — BH
* * C O P Y * *
January 23, 2008**
**11:23:09**

**Civ Fil Non-Pris**
USAO #.: 08CV0128 CIVIL FILING
Judge..: MARILYN L HUFF
Amount.:                $350.00 CK
Check#.: BC# 6646

**Total—>    $350.00**

FROM: CARMICHAEL V. LEAP WIRELESS
        CIVIL FILING